**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VICTORIA R.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20-cv-04444** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Victoria R. ("Claimant") brings a motion for summary judgment to reverse the final

decision of the Commissioner of Social Security ("Commissioner") denying her claim for

disability insurance benefits ("DIBs"). The Commissioner brings a motion for summary

judgment seeking to uphold the decision to deny benefits. The parties have consented to the

jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has

jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons discussed herein,

Claimant's motion for summary judgment, (Dckt. #12), is denied and the Commissioner's

motion for summary judgment, (Dckt. #15), is granted.

**I.      BACKGROUND**

On May 11, 2017, Claimant (then fifty-one years old) filed a disability application

alleging disability dating back to March 27, 2017, due to limitations from lumbar spinal stenosis,

degenerative arthritis of the lumbar spine, lumbar radiculopathy, pseudoarthrosis of the lumbar

spine, chronic back pain, anxiety symptoms, depression, and panic attacks. (R. 211).

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court
refers to plaintiff only by her first name and the first initial of her last name. Acting Commissioner of
Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

Claimant's application was denied initially and upon reconsideration.  (R. 15).  Claimant filed a

timely request for a hearing, which was held on June 26, 2019, before Administrative Law Judge

("ALJ") Michael Hellman.  (R. 31-83).  On September 3, 2019, the ALJ issued a written decision

denying Claimant's application for benefits.  (R. 12-30).  Claimant filed a timely request for

review with the Appeals Council.  The Appeals Council denied Claimant's request for review on

June 4, 2020, (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner.

This action followed.

### B.    The Social Security Administration Standard

To qualify for disability benefits, a claimant must demonstrate that she is disabled,

meaning she cannot "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death, or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. §423(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or

profit, whether or not a profit is realized."  20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims.  20 C.F.R. §404.1520.  The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability.  20 C.F.R.

§404.1520(a)(4)(i).  At step two, the ALJ determines whether the claimant has one or more

medically determinable physical or mental impairments.  20 C.F.R. §404.1521.  An impairment

"must result from anatomical, physiological, or psychological abnormalities that can be shown

by medically acceptable clinical and laboratory diagnostic techniques."  *Id.*  In other words, a

physical or mental impairment "must be established by objective medical evidence from an

acceptable medical source."  *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at

2

*2 (N.D.Ind. Oct. 22, 2019).  If a claimant establishes that she has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month durational requirement noted above.  20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings").  The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a listing, she is considered disabled and no further analysis is required.  If a listing is not met, the analysis proceeds.  20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), meaning her exertional and non-exertional capacity to work despite the limitations imposed by her impairments.  Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work.  20 C.F.R. §404.1520(a)(4)(iv).  If the claimant can do so, she is not disabled.  *Id.*  If she cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience.  If such jobs exist, the individual is not disabled.  20 C.F.R. §404.1520(a)(4)(v).

### C.    The Evidence Presented to the ALJ

Claimant seeks DIBs due to limitations from lumbar spinal stenosis, degenerative arthritis of the lumbar spine, lumbar radiculopathy, pseudoarthrosis of the lumbar spine, chronic back pain, anxiety symptoms, depression, and panic attacks.  The administrative record contains the following evidence that bears on her claim:

### 1.    Evidence from Claimant's Treating Physicians

Beginning in 2014, Claimant presented to her treating physicians with severe back pain and left leg pain – particularly in her left knee – both of which worsened over time.  (R. 1287). In May 2016, an MRI showed abnormal results.  (*Id.*).  After a surgery consult, Claimant was found to have a calcified cyst on her spine, lateral recess stenosis, and a large disk herniation, causing significant nerve root compression.  (*Id.*).  On June 7, 2016, Claimant underwent a laminectomy and an "urgent lumbar discectomy" to address these concerns.  (R. 629).

After her surgery, Claimant reported that the discomfort in her left knee was almost entirely resolved.  (R. 1713).  Her knee pain was reduced by 85%, (R. 1745), and she reported that "the pain down the leg completely went away and her strength feels great," (R. 1746). About four months later, however, Claimant again began experiencing lower back pain, which radiated across her lower back and into her left hip.  (R. 742, 1687).  She completed physical therapy in August 2017, after which she reported her back was "feeling great."  (R. 1713).

On September 1, 2017, one of Claimant's treating physicians, Ryan Thrombley, M.D., completed a disability evaluation form on her behalf.  (R. 628).  He noted that Claimant had positive straight leg tests, which could indicate nerve root compression.  (*Id.*).  He described her gait as antalgic and slow, but noted that she was ambulatory, was not prescribed an assistive device by a physician, and did not need an assistive device for walking, standing, or balancing. (R. 629).  According to Dr. Thrombley, Claimant could stand or walk for ten minutes at a time and could walk three to four blocks.  (*Id.*).  He further noted that she could only sit or stand for fifteen minutes at a time before switching to an alternate position.  (*Id.*).

Claimant continued complaining of severe lower back pain throughout 2018 and 2019. Throughout this period, Kenneth Holmes, M.D., routinely examined Claimant and described the

symptoms related to her back pain.  He observed that Claimant had a normal stance and a mildly antalgic gait, with a mild limp on the left side.  (R. 752, 759, 763, 767).  He also repeatedly noted negative straight leg tests and five out of five strength in Claimant's extremities.  (R. 759, 763).  On December 5, 2018, and again on May 30, 2019, Dr. Holmes found that Claimant's EMG and nerve conduction study showed normal results.  (R. 763).  Other nerve conduction studies were similarly "normal with no evidence of any active lumbosacral radiculopathy."  (R. 1019, 1746).

In addition to her physical symptoms, Claimant began experiencing "reactive depression" due to ongoing pain.  (R. 1691).  Her primary care physician, Girma B. Assefa, M.D., prescribed her Duloxetine, an antidepressant, but refrained from referring her to a mental health center.  (R. 1690).  Dr. Assefa prescribed Duloxetine from at least June 6, 2017, (R. 1689), through June 1, 2019, (R. 294), and noted that the medication helped alleviate Claimant's symptoms, (R. 1705).

## 2.    Evidence from Examining Physicians

On July 8, 2017, Efesomwan Aisien, M.D., conducted a consultative examination of Claimant.  Claimant informed Dr. Aisien that she was unable to walk more than half a block and could not stand or sit for more than five minutes at a time.  (R. 572).  Dr. Aisien observed that Claimant was able to get on and off the exam table with some difficulty, could not walk greater than fifty feet without support, and was unable to perform a toe/heel walk.  (*Id.*).  She also found that Claimant's motor strength was five out of five in all limbs and her manner was "appropriate, polite, pleasant, and cooperative."  (*Id.*).

On July 14, 2017, the state agency referred Claimant to Jeffrey Karr, Ph.D., P.C., for a psychological consult.  Dr. Karr conducted a forty-minute examination of Claimant, during which Claimant opined that she was totally dependent on her husband, even for simple tasks such as using a microwave and doing laundry.  (R. 581).  Claimant further reported that she did

not have ongoing friendships and avoided going outside because she felt uncomfortable in public.  (R. 582).  Claimant "was intermittently tearful, at times uncontrollably," throughout the exam and Dr. Karr noted that she appeared anxious.  (R. 581).  She seemed to have difficulty concentrating and occasionally required repeated instructions.  (*Id.*).  Claimant could not recall any of three items or perform simple calculations, such as ten minus six.  (*Id.*).  She could not describe how an orange and a banana, or a tree and a bush were alike.  (R. 581-82).  Dr. Karr diagnosed Claimant with major depressive disorder.  (R. 582).

### 3.    Evidence from State Agency Consultants

State agency consultants James Hinchen, M.D., and Vidya Madala, M.D., reviewed Claimant's file on October 17, 2017, and April 8, 2018, respectively, and found that Claimant was limited to light work with postural limitations including occasionally climbing ramps, stairs, ladders, ropes, and scaffolds, stooping, and crawling.  (R. 93).  They also limited Claimant to frequent balancing and noted that she could crouch and kneel unlimitedly.  (*Id.*).  They found that Claimant had the physical RFC to perform her past work as a case administrator, as performed by Claimant.  (R. 94).

State agency psychologist Lionel Hudspeth, Psy.D., reviewed Claimant's file on August 25, 2017.  (R. 91).  He found that Claimant had the medically determinable impairment of depression, and that the impairment was "severe."  (R. 90).  Dr. Hudspeth further found, however, that Claimant had: (1) mild limitations in understanding, remembering, or applying information; (2) mild limitations in concentration, persistence, and pace; (3) no limitation in her ability to interact with others; and (4) no limitation in adapting or managing herself.  (*Id.*).  He noted that Claimant may have "some diminished [concentration] skills due to pain issues," but concluded that the record did not support her allegations of deficits in memory, concentration,

understanding and following directions, or getting along with others. (*Id.*). He deemed her presentation at the consultative examination with Dr. Karr to be the result of "poor effort," and concluded that he "would see her mental health issue as non-severe." (*Id.*).

State agency consultant Steven Fritz, Psy.D., reviewed Claimant's file on April 4, 2018, and reached the same conclusions as Dr. Hudspeth. (R. 105-06). He added that Claimant had not required, sought, or received any mental health treatment since her consultative examination with Dr. Karr, a fact that he found was "consistent with the initial finding of no severe mental impairment." (R. 106).

### 4.      Evidence from the Hearing Testimony

At the June 26, 2019 hearing, Claimant testified that, prior to her 2016 back surgery, she had worked as a case administrator in the federal bankruptcy court for twenty-five years and had graduated with a bachelor's degree from Chicago State University in 2014. (R. 41, 43).

Claimant testified that she can no longer walk without a walker or cane and uses a wheelchair when she goes to the grocery store. (R. 50). She can stand for fifteen minutes before pain begins and she can sit between fifteen and twenty minutes before she needs to get up. (*Id.*). She can walk twenty-five to fifty feet before needing to stop and rest. (*Id.*). She tries to avoid stairs, but can climb them slowly. (R. 52). She cannot independently shower, lift a gallon of milk with one hand, pick something up off the floor, touch her toes, kneel, move from side to side, or move her arms above her shoulders. (R. 53-54). Claimant is afraid to drive because she is unable to twist to check her blind spots, but she can ride in a car. (R. 55). She described the pain as a burning or numb sensation when she sits, but a stabbing when she stands. (R. 69).

Claimant takes Duloxetine for anti-depression, but it causes nausea, sweating, hallucinations, and nightmares. (R. 56). She has not seen any specialists for her depression. (R.

74).   She sleeps about two hours at night and stays in bed until noon.  (R. 60).  She reported

memory loss and an inability to focus or concentrate.  (R. 63-64).  She reported having difficulty

dealing with the public and relating to people.  (R. 66).

Vocational expert ("VE") Toby Andre also testified at the hearing.  He noted that

Claimant's past work as a court administrator has a highly skilled level, a light exertional level,

and was performed by Claimant at the sedentary range.  (R. 77).  The ALJ asked the VE to

consider the following hypothetical individual:

> [An individual who is] capable of lifting up to [ten] pounds occasionally, standing
> and/or walking for approximately two hours in an eight-hour workday, and sitting
> for approximately six hours in an eight-hour workday.  Assume further that the
> hypothetical individual retains capacity for balancing on a frequent basis, and
> climbing ladders, ropes, scaffolds, ramps, or stairs, and kneeling on an occasional
> basis.  And the individual has to avoid occasional exposure to unprotected heights
> and hazardous terrain.

 (*Id.*).  The VE testified that this individual could not perform Claimant's past work as performed

by the general population, but could perform Claimant's past work as performed by Claimant.

(*Id.*).  If the same individual were unable to maintain eight hours of sitting, standing, and walking

for an eight-hour workday, the VE said she could not perform Claimant's past work.  (R. 78).

The ALJ asked the VE whether the same hypothetical individual could perform

Claimant's past work if she were permitted to alternate between sitting and standing every fifteen

minutes.  (R. 77).  The VE testified that, in his professional opinion, "as long as the quality and

quantity of the work will remain at the level expected by the employer, and the individual would

not go off task when standing from the sitting position," the individual could perform Claimant's

past work as performed by Claimant, but not as performed in the general population.  (R. 78).

The VE noted that there would be no competitive work available for any individual who was off

task for more than 15% of the workday.  (*Id.*).

### D.    The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching his decision to deny Claimant's request for benefits.  At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date of March 27, 2017.  (R. 17).  At step two, the ALJ determined that Claimant suffered from the severe impairments of "degenerative disc disease of the lumbar spine, with spinal stenosis, left knee arthralgia, patella alta, and chondromalacia."  (R. 18).  The ALJ found that Claimant's depression was medically determinable, but non-severe.  (*Id.*).  At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including listing 1.04 (disorder of the spine) and listing 1.02 (major dysfunction of a joint).  (R. 19-20).

Before turning to step four, the ALJ determined that Claimant had the RFC to perform sedentary work with the following limitations:

> [M]ay stand or walk for approximately two hours in an eight-hour workday and sit for six hours in an eight-hour workday.  She is able to lift up to ten pounds occasionally and less than ten pounds frequently.  She may occasionally climb ladders, ropes, or scaffolds and occasionally climb ramps or stairs.  She may frequently balance and occasionally stoop and kneel.  The Claimant must have the option to sit or stand and alternate positions every fifteen minutes.  The Claimant should avoid occasional exposure to unprotected heights and hazardous terrain.

(R. 20).  At step four, the ALJ determined that Claimant has the capacity to perform her past relevant work as a court administrator as she performed it, but not as generally performed according to the DOT.  (R. 24).  As such, the ALJ found that Claimant was not under a disability from her alleged onset date through the date of his decision.  (*Id.*).

## II.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted).  The Commissioner's decision must also be based on the proper legal criteria and free from legal error.  *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or by otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to his conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

III.     **ANALYSIS**

Claimant asserts that the ALJ erred by (1) finding Claimant's depression was non-severe at step two; (2) failing to consider Claimant's depression in the RFC assessment; (3) finding that Claimant did not meet any listing at step three; and (4) failing to explain why he did not find that Claimant would be off task for 15% of the workday.  The Court will address each argument in turn.

      **A.      The ALJ adequately supported his finding that Claimant's depression is non-severe.**

In analyzing the severity of mental impairments at step two, the ALJ must use the "special technique" set forth in 20 C.F.R. §404.1520(a).  *Craft*, 539 F.3d at 674.  Under the special technique, the ALJ must evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] has a medically determinable impairment."  20 C.F.R. §404.1520a(b)(1).  The ALJ must then rate the degree of the claimant's limitations across four broad functional areas known as the "paragraph B" criteria.  If the ALJ rates the degrees of the claimant's limitation in these areas as "none" or "mild," he will generally conclude that the impairment is not severe.  20 C.F.R. §404.1520a(d)(1).  Here, the ALJ concluded that Claimant has only mild limitations in each paragraph B category and, accordingly, deemed Claimant's depression to be non-severe.  (R. 18).

Claimant argues that this conclusion was not supported by substantial evidence because, in reaching it, the ALJ "ignored" the finding of "the only examining mental-health professional, the state agency's own psychological consultative examiner" that Claimant's depression was severe.  (Dckt. #12 at 5).  According to Claimant, this error requires reversal.  The Court disagrees for two reasons.

First, Dr. Karr – who was the only mental health professional who examined Claimant – diagnosed Claimant with "major depressive disorder" but did not find that Claimant's depression was a "severe" impairment. Being diagnosed with depression does not automatically compel a finding that a claimant has a disabling mental impairment where the depression is controlled with medication or some other form of treatment. *See, e.g., Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (depression is not disabling because it was controlled); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (affirming ALJ's finding that claimant who was diagnosed with depression and panic attacks did not have a disabling mental impairment where her conditions were treated and controlled with medication); *Brown v. Saul*, 799 Fed.Appx. 915, 919 (7th Cir. 2020) ("conditions that can be controlled with medication are not disabling."). Here, the ALJ found – without dispute by Claimant – that "she was taking Duloxetine with success to manage her depressive complaints." (R. 23; Dckt. #12 at 10).

Second, the ALJ properly found the opinions of state agency consultants Drs. Hudspeth and Fritz were "unpersuasive" to the extent that they found that the impairment caused by Claimant's depression was "severe" because their findings in this regard were "internally inconsistent and inconsistent with the evidence of record." (R. 19). Indeed, both doctors noted that they "would see [Claimant's] mental health issue as *non-severe*" in the narrative sections of their reports. (R. 90-91, 106) (emphasis added). They also found that Claimant had only: (1) mild limitations in understanding, remembering, or applying information; (2) mild limitations in concentrating, persisting, or maintaining pace; (3) no limitation in interacting with others; and (4) no limitation in adapting or managing herself, all of which are findings more consistent with a non-severe impairment. (R. 90, 106). Under the governing regulation, (20 C.F.R. §404.1520a(d)(1), "[i]f we rate the degrees of your limitations as 'none' or 'mild,' we will

generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."

Drs. Hudspeth and Fritz further noted that while Claimant "may indeed have some diminished concentrational skills due to pain issues," her allegations regarding difficulties with memory, concentration, understanding, following instructions, or getting along with others lacked evidentiary support. (*Id.*). They attributed Claimant's performance during Dr. Karr's evaluation to "poor effort," noting that Claimant "has [twenty-five] years of work experience in highly skilled job, college [plus] education, yet she does not know how an apple and banana / bush and tree are alike." (*Id.*). When considering the opinions of Drs. Hudspeth and Fritz in their entirety, therefore, the Court finds that the ALJ's decision to discredit their statement that Claimant had a severe impairment on the grounds that it is internally inconsistent and inconsistent with the record as a whole was reasonable. Nothing more is required under the applicable standard of review. *See Elder*, 529 F.3d at 413.

> **B.** **Claimant's argument that the ALJ failed to consider her depression when determining her RFC has been waived and is without merit in any event.**

In her response to the Commissioner's summary judgment motion, Claimant asserted for the first time that the ALJ erred by failing to consider whether her depression and anxiety warrant further limitations to her RFC. (Dckt. #17 at 1). By failing to present this argument in her own motion to reverse the Commissioner's decision, Claimant deprived the Commissioner of an opportunity to respond and thereby waived the argument. *See, e.g., Carter v. Astrue*, 413 Fed.Appx. 899, 906 (7th Cir. 2011); *Kimberly S. v. Saul*, No. 19 C 6480, 2021 WL 1253454, at *4 (N.D.Ill. Apr. 5, 2021); *Akhmedov v. Berryhill*, No. 3:16-CV-02017-SB, 2017 WL 5598811, at *8-9 (D.Or. Nov. 21, 2017).

In any event, Claimant's assertion that the ALJ failed to consider whether her depression warranted further limitations to her RFC is factually incorrect. Specifically, the ALJ discussed Claimant's depression in the course of formulating Claimant's RFC and found that it imposed no limitations on her ability to work:

> [Claimant] was taking Duloxetine with success to manage her depressive complaints. She has not been receiving counseling services coincident with the use of the medication. Lastly, the claimant presented to Dr. Jeffrey Karr for a psychological evaluation in a tearful manner in July 2018. Yet she never showed such ongoing distress to any of her own providers thereafter.

(R. 23); *see Lawrence J. v. Saul*, No. 19-cv-1834, 2020 WL 108428, at *3 (N.D.Ill. Jan. 9, 2020) (noting that "by no means is it a given that a mild limitation in mental functioning will impact a claimant's ability to secure employment"); *D.C. v. Comm'r of Soc. Sec.*, No. CV 20-2484 (RBK), 2021 WL 1851830, at *5 (D.N.J. May 10, 2021) (where an ALJ concludes that a claimant's limitation would not limit her ability to perform required work tasks, the ALJ may exclude that limitation from the RFC without error).

The Court notes that Claimant did not suggest further restrictions that she believes should have been included in the RFC, *see Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("It is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none."), and that no medical opinion recommended specific functional limitations beyond those included in the RFC. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (finding that an ALJ does not commit an error when "there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ."); *Matthews v. Saul*, 833 Fed.Appx. 432, 436 (7th Cir. 2020) (same).

14

By engaging in an analysis of the limitations imposed by Claimant's depression at Step 2 *and* addressing Claimant's depression in his RFC assessment, the ALJ fulfilled his duty of "build[ing] a logical bridge between the evidence and his decision to omit non-exertional mental limitations from the ultimate RC finding [and] remand is not required." *Handford v. Saul*, No. 18-CV-607-SLC, 2019 WL 4727771, at *2 (W.D.Wis. Sept. 27, 2019); *see also Schmidt v. Astrue*, 496 F.3d 833, 844-45 (7th Cir. 2007); *Barry v. Kijakazi*, No. 1:20-CV-00619-BAM, 2022 WL 799665, at *4-5 (E.D.Cal. Mar. 16, 2022); *Sanguras v. Saul*, No. 1:19-CV-1036 JLT, 2021 WL 973940, at *5-6 (E.D.Cal. Mar. 16, 2021); *D.C.*, 2021 WL 1851830, at *5-6; *Hansford v. Saul*, No. 18-CV-607-SLC, 2019 WL 4727771, at *2 (W.D.Wis. Sept. 27, 2019); *Lewis v. Acting Comm'r of Soc. Sec.*, No. 417CV04172SLDJEH, 2018 WL 4468973, at *3 (C.D.Ill. Sept. 18, 2018).

### C. The ALJ provided sufficient analysis for his finding that Claimant's impairments did not meet or equal a listed impairment.

At step three, the ALJ found that Claimant's impairments did not meet or medically equal listing 1.02 (major dysfunction of a joint) or listing 1.04 (disorders of the spine). (R. 19-20). Claimant argues that these findings constitute reversible error, as does the ALJ's failure to consider whether Claimant's impairments met listings 1.03 (reconstructive surgery of a major weight-bearing joint), 12.04 (depressive disorder), or 12.06 (anxiety and obsessive-compulsive disorder). The Court disagrees and finds that the ALJ's step three analysis was sufficient.[2]

---

[2] Claimant also makes the perfunctory argument that if she does not meet the criteria for listing 1.03, 1.04, or 12.04, she demonstrates "comparable" limitations "throughout her medical records." (Dckt. #12 at 8, 10, 11). While it is true that a claimant may show "medical equivalence" if her impairment "is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §404.1526(a), in order to meet this equivalency test, the claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). Claimant failed to cite such evidence here. Absent such evidence, an ALJ "does not have to separately discuss equivalence." *Deloney v. Saul*, 840 Fed.Appx. 1, 3 (7th Cir. 2020) (citing Social Security Ruling (SSR) 17-2p, 82 Fed. Reg. 15,263, 15,265 (Mar. 27, 2017) (an ALJ need not articulate specific evidence

The listings describe impairments considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§404.1525(a), 416.925(a). The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To match a listed impairment, the claimant bears the burden of showing that his impairment meets "all of the specified medical criteria." *Id.* at 530; *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530; *Ribaudo*, 458 F.3d at 583.

When a listing is relevant, the ALJ must: (1) identify the appropriate listing by name, (2) give more than a perfunctory analysis of the issues involved, and (3) "consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *see also Cirelli v. Astrue*, 751 F.Supp.2d 991, 1002 (N.D.Ill. 2010). A listing discussion is perfunctory when an ALJ "provides nothing more than a superficial analysis" of the listing's criteria. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).

### 1.    Claimant has failed to establish that her impairment meets listing 1.02

Listing 1.02, "major dysfunction of a joint," applies to musculoskeletal impairments. The impairment must involve at least one major peripheral weight-bearing joint (hips, knees, ankle) and the claimant must prove a "gross anatomical deformity" (e.g., subluxation, contracture, bony or fibrous ankylosis, instability), and an inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, App.1 §1.02.

Here, the ALJ found that Claimant did not meet this listing because Claimant's "left knee symptoms improved with surgery and physical therapy," and "her medical providers observed

_____

supporting a finding that an impairment does not medically equal a listed impairment; a simple statement of non-equivalence will suffice)).

normal range of motion." (R. 20). In support of her argument to the contrary, Claimant cites her

subjective reports of pain and discomfort, as well as her own testimony describing difficulty

ambulating. (Dckt. #12 at 8-9). She does not, however, assert that there is a gross anatomical

deformity in either her knee or hip, as is required by the listing. (R. 1746) (noting that EMG of

Claimant's hip showed no abnormalities). As the ALJ found – and Claimant does not dispute –

Claimant's knee pain was significantly alleviated by the 2016 laminectomy. *See* (R. 1745)

(Claimant reported that the pain in her knee was reduced by 85%); (R. 1746) ("The patient states

that the pain down the leg completely went away and her strength feels great."); (R. 729)

(primary care physician noted Claimant's knee had improved with physical therapy); (R. 731)

(Claimant demonstrated full range of motion in knee).

Claimant also fails to present evidence contradicting the ALJ's finding that she could

ambulate effectively within the meaning of the listing. Under §1.00(B)(2)(b) of Appendix 1,

"[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an

impairment(s) that interferes very seriously with the individual's ability to independently initiate,

sustain, or complete activities." This level of impairment "is defined generally as having

insufficient lower extremity functioning . . . to permit independent ambulation without the use of

a hand-held assistive device(s) that limits the functioning of both upper extremities," such as a

walker, two crutches, or two canes. *Id.*

The ALJ acknowledged Claimant's testimony that she was unable to walk without a cane,

but noted that the "the medical record does not document prescription of a cane by any

physician."[3] (R. 23). Indeed, Claimant's own treating physician reported that Claimant (1) did

---

[3] That this finding was made in ALJ's RFC analysis is immaterial. An ALJ's step three discussion is sufficient so long as the decision, "read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

17

not need an assistive device for walking, standing, or balancing; (2) could walk three to four blocks; (3) could stand or walk for ten minutes at a time; and (4) had an "antalgic, slow gait." (R. 629). Other evidence cited by the ALJ further supports his finding that Claimant could ambulate effectively. *See* (R. 657) (2018 hospital records noted Claimant was ambulatory without a wheelchair, walker, or cane); (R. 708) (2018 notes indicate "no difficulty walking"); (R. 752) (2018 records noting "left antalgic gait with mild limp on left leg," "tandem gait normal on toes, heels, and tandem"); (R. 759) (2019 records noting "[g]ait is normal on her toes heels and tandem other than being mildly antalgic with mild limp on the left leg"). Claimant admits that she has sufficient mobility to walk three or four blocks. (Dckt. #12 at 10).

"To demonstrate that the ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify record evidence that was misstated or ignored, and that could support a finding that claimant met or equaled the criteria." *Robert S. v. Kijakazi*, No. 1:20-cv-2235-MG-RLY, 2021 WL 5979361, at *6 (S.D.Ind. Dec. 16, 2021) (citing *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002)). Claimant fails to identify any evidence that was ignored or misstated by the ALJ. Instead, Claimant focuses on evidence that the ALJ specifically considered but found unpersuasive. In effect, she asks the Court to reweigh the evidence and substitute its own judgment for that of the ALJ – something this Court cannot do. *See, e.g., McKinzey*, 641 F.3d at 889; *Elder*, 539 F.3d at 413.

### 2. Claimant has failed to establish that her impairment meets listing 1.03.

Although the ALJ did not consider listing 1.03, "reconstructive surgery of a major weight-bearing joint," this omission does not constitute an error where Claimant failed to present evidence that the listing was relevant. Listing 1.03 applies when a claimant has undergone "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to

18

ambulate effectively . . . within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §1.03. The listings define major weight-bearing joints as "the major peripheral joints, which are the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot, as opposed to . . . axial joints (i.e., joints of the spine)." *Id.* at §1.00F. As the Commissioner notes, Claimant's laminectomy – which involved the removal of a vertebral bone to ease pressure on the spinal cord – does not fall into this category. *See Kimak v. Colvin*, No. 12 CV 7292, 2014 WL 1758638, at *7 (N.D.Ill. May 2, 2014) ("Kimak simply has not shown that his 1996 spinal surgery impacted joints included in the [1.03] listings definition."). Listing 1.03 also requires Claimant to show that she has not returned to effective ambulation. As explained above, the ALJ reasonably concluded that she had.

### 3. Claimant has failed to establish that her impairment meets listing 1.04.

To meet listing 1.04, "disorders of the spine," Claimant must show that she suffers from a disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), that results in the compromise of a nerve root (including the cauda equina) or the spinal cord. The listing also requires one of the following:

1. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); OR

2. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; OR

3. Lumbar spinal stenosis resulting in pseudoclaudication established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, resulting in inability to ambulate effectively, as defined in 1.00B2b.

19

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04.

The ALJ acknowledged that Claimant suffered from "mild central spinal canal stenosis," (R. 21), but found that Claimant did not meet listing 1.04 because "she had generally normal muscle strength and bulk, and some negative straight leg raise tests." (R. 19). He also noted that there was no post-surgery evidence of fracture or hardware loosening and that no medical expert or consultant had determined that Claimant's impairments met or equaled this listing. (*Id.*). Because Claimant does not address these findings, much less contradict them, she has waived any argument regarding listing 1.04. *See Lisa S. v. Saul*, No. 19 C 862, 2020 WL 5297028, at *7 (N.D.Ill. Sept. 4, 2020) ("Claimant cannot show that the ALJ incorrectly assessed the criteria of listings . . . by overlooking the ALJ's actual findings and citing no evidence to dispute them."); *see Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 719 (7th Cir. 2012) (conclusory or undeveloped arguments are waived).

Claimant's argument regarding listing 1.04 also fails because she does not cite evidence that would be sufficient to satisfy the requirements of paragraphs A, B, or C of the listing. In particular, Claimant's impairment does not satisfy the requirements of 1.04A because she did not experience nerve root compression following her 2016 surgery. Instead, she cites *pre-surgery* reports indicating nerve root compression, (R. 1287), which were also acknowledged by the ALJ in his decision, (R. 21). Claimant does not dispute the ALJ's finding that nerve conduction studies from *after* Claimant's lumbar laminectomy "were normal with no evidence of any active lumbosacral radiculopathy." (*Id.*). *See* (R. 1746) (post-surgery MRI showed "normal canal and neural foramina reported at all lumbar levels;" EMG "was found to be normal"). Claimant also cites no evidence of "motor loss atrophy with associated muscle weakness or muscle weakness," another 1.04A requirement. As the ALJ noted, Claimant has generally shown normal muscle

20

strength.  *See* (R. 573) (motor strength was five out of five in all limbs); (R. 763) ("normal muscle bulk and tone with no fasciculations or drift and [five] out of [five] strength proximally and distally in all [four] extremities"); (R. 710) ("normal" muscle strength and tone).  Because both nerve root compression and motor loss are required under the listing, the ALJ's finding that Claimant's back impairment did not satisfy 1.04A is supported by substantial evidence.

As for listing 1.04B, it requires a diagnosis of spinal arachnoiditis, which must be "confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging."  The ALJ noted that there is no evidence of this condition in the record, (R. 19), and Claimant does not argue otherwise, (Dckt. #12 at 8).  Finally, listing 1.04C – like listings 1.02 and 1.03, addressed above – includes a requirement that Claimant be unable to ambulate effectively, and Claimant has failed to make this showing.

### 4.  Claimant has failed to establish that her impairment meets listing 12.04.

Listing 12.04, "depressive, bipolar, and related disorders," has three paragraphs: A, B, and C.  To fall under this listing, a claimant's mental impairment must "satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C."  20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.04.  Paragraph A lists the medical documentation required to characterize major depressive disorder.  Because the ALJ acknowledged that Claimant has the medically determinable mental impairment of depression, the threshold requirement of paragraph A is not at issue here.  (R. 18).  Under paragraph B, the affective disorder must result in at least one extreme or two marked limitations in the previously discussed areas of mental functioning. Claimant cannot make this showing because – as explained above – the ALJ's finding that Claimant experiences no more than minimal limitations in any paragraph B category is supported by substantial evidence.  *See* Section III(A), *supra*.

21

Under paragraph C, Claimant must show that her mental disorder is "serious and persistent," meaning she has:

> a medically documented history of the existence of the disorder over a period of at least [two] years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and (2) marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

20 C.F.R. Pt. 404, Subpt. P, App. 1. Stated differently, Claimant must demonstrate that despite diminished symptoms from ongoing treatment, her ability to adjust is fragile. *Id.* at §12.00G(2)(b)-(c). Claimant argues that she met the paragraph C criteria because she has been treated for depression for at least two years, as evidenced by her Duloxetine prescriptions from June 2017 through June 2019. (Dckt. #12 at 10). However, contrary to the assertion of Claimant's counsel, (Dckt. #12 at 6), the record indicates that Dr. Assefa prescribed Duloxetine from June 6, 2017, (R. 1689), through June 1, 2019, (R. 294), which is five days short of two years.

Even if Claimant had been prescribed Duloxetine for two years or more, and assuming an anti-depressant prescription from a primary care provider constitutes mental health treatment for the purposes of the paragraph C analysis,[4] Claimant admits that the treatment improved her symptoms. (Dckt. #12 at 10). She also cites no evidence indicating that, despite these diminished symptoms, she has only achieved "marginal adjustment." For all of these reasons, Claimant has failed to meet her burden of showing that she meets the requirements of listing 12.04 and the ALJ did not err by failing to explicitly reference the listing in his step three

---

[4] *See Michael M. v. Saul*, 1:19-cv-212, 2020 WL 57989, at *9 (N.D.Ind. Jan. 6, 2020) (finding that prescription medication management via primary care providers constitutes mental health treatment, as "depression is now one of the most common disorders treated in the primary care setting").

analysis. *See Rice*, 384 F.3d at 369-70 (declining to find that the ALJ must expressly refer to every potentially relevant listing).

> **5.      Claimant has failed to establish that her impairment meets listing 12.06.**

Listing 12.06, "anxiety related disorders," requires medically documented findings of an anxiety disorder; panic disorder or agoraphobia; or obsessive compulsive disorder. 20 C.F.R. §404, Subpt. P, App. 1. However, the only mental health specialist to examine Claimant, Dr. Karr, did *not* diagnose her with an anxiety disorder. (R. 583). Moreover, no mental health specialist diagnosed Claimant with any disorder mentioned in the listing. Finally, listing 12.06 – like listing 12.04 – requires a finding that Claimant demonstrate either (1) extreme limitation of one or marked limitation of two areas of mental functioning; or (2) medical treatment with marginal adjustment. 20 C.F.R. §404, Subpt. P, App. 1. As explained above, Claimant failed to demonstrate either. Accordingly, Claimant failed to meet her burden of showing that she meets the requirements of listing 12.06 and the ALJ did not err by declining to explicitly consider listing 12.06 in his step three analysis. See *Rice*, 384 F.3d at 369.

> **D.      The ALJ did not err by omitting a discussion of off-task time in his RFC analysis.**

During the June 26, 2019 hearing, the ALJ asked the VE what the threshold would be for off-task behavior in Claimant's past relevant work as a case administrator. (R. 78). The VE responded that there would be no competitive work available for any individual who is off task for more than 15% of the workday. (R. 78). Seizing on this question and response, Claimant contends that the ALJ's failure to analyze Claimant's propensity for off-task behavior in the RFC discussion warrants remand. The Court disagrees.

To begin, Claimant does not argue that she would, in fact, be off task for 15% of the day and the Court finds no medical opinion evidence in the record to support such a limitation.  *See Spring W. v. Saul*, No. 20 C 1864, 2021 WL 2529615, at *6 n.5 (N.D.Ill. June 21, 2021) (where "no doctor opined that [claimant] would require an off-task time limitation . . . [claimant's] argument that the ALJ should have included an off-task time limitation, lacks merit.").

Instead, Claimant asserts that *any time* an ALJ solicits testimony from a VE with respect to off-task behavior, the ALJ must explicitly explain why he did not include that limitation in the RFC.  (Dckt. #12 at 13).  However, "the ALJ was not required to discuss every response the VE gave to hypotheticals the ALJ ultimately discarded."  *Clemente A. v. Saul*, No. 18-cv-6345, 2019 WL 3973117, at *5 (N.D.Ill. Aug. 22, 2019) (citing *Winsted v. Saul*, 923 F.3d 472, 477 (7th Cir. 2019)).  Instead, "[t]he Seventh Circuit has made it clear that the ALJ is only required to include limitations that are supported by the record in the hypotheticals posed to the VE and in the RFC assessment."  *Id.* (citing *Winsted*).  Consequently, an ALJ does not err by posing a hypothetical regarding an off-task limitation to the VE and not including the VE's response in the RFC assessment when the medical record does not support an off-task restriction.  *Id.*, at *5; *Cf. Winsted*, 923 F.3d at 476-77 (holding that the ALJ erred not by failing to consider the VE's response to a hypothetical relating to time off task, but by failing to pose a hypothetical to the VE which accounted for claimant's medically documented limitations with concentration, persistence, and pace); *Hawist v. Berryhill*, No. 17 cv 50126, 2018 WL 6399094, at *4 (N.D.Ill. Dec. 6, 2018) (where claimant had a medically documented off-task limitation, the ALJ erred by not discussing VE's response to hypothetical concerning claimant's off-task behavior when formulating claimant's RFC).

24

In sum: because Claimant did not have any medically documented limitation specifying an amount of time she would be off task, the ALJ did not err by failing to discuss the ALJ's response to the hypothetical concerning off-task time when formulating Claimant's RFC.

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #12), is denied and the Commissioner's motion for summary judgment, (Dckt. #15), is granted.  The decision of the Commissioner is affirmed.

**ENTERED:    August 18, 2022**

**Jeffrey I. Cummings**
**United States Magistrate Judge**